## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TAMMY L. MITROW,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:05-0064** |
| **v.** | : | **(MUNLEY, D.J.)** |
| | | **(MANNION, M.J.)** |
| **VERIZON COMMUNICATIONS,** | : | |
| **INC., VERIZON PENNSYLVANIA,** | | |
| **INC., d/b/a VERIZON, VERIZON** | : | |
| **BENEFITS CENTER, d/b/a** | | |
| **VERIZON, & JAMES SANDERS,** | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

Before the court are the plaintiff's and the defendants' cross-motions for summary judgment. For the following reasons, the court recommends that the motions be granted in part and denied in part and the plaintiff's complaint be dismissed in part and set for trial on the remaining claims.

## I.   Procedural History

The plaintiff commenced this action on January 10, 2005, by filing her complaint, raising allegations against Verizon Communications, Inc., and Verizon Pennsylvania, Inc., under the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq. (2006), the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq. (2006), and the Pennsylvania Human Relations Act of 1955, 43 PA. CON. STAT. ANN. § 955 (West 2006).[1]

---

[1]The "analysis of an ADA claim applies equally to a PHRA claim." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (citing Kelly

(Doc. No. 1.)  On September 3, 2005, the plaintiff amended her complaint, adding as defendants Verizon Benefits Center, James Sanders, and Core Inc. She specified that her FMLA claim is against all defendants and her ADA and PHRA claims are against Verizon Communications, Verizon Pennsylvania, and Verizon Benefits Center (collectively, "Verizon").  She also added a third count, a claim against all defendants under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. (2006).  (Doc No. 24.)  Defendants Verizon Communications and Verizon Pennsylvania answered the amended complaint on October 6, 2005.  (Doc. No. 32.)  On November 15, 2005, the court approved a stipulation between the plaintiff and defendant Core by which defendant Core was terminated from the case and the ERISA count was "withdrawn and dismissed, with prejudice, as to the remaining defendants with respect to any COBRA allegations or allegations regarding non-pay."  (Doc. Nos. 40 & 41.)  Defendants Verizon Benefits Center and Sanders answered the amended complaint on November 18, 2005.  (Doc. No. 42.)

As amended and modified, the plaintiff's complaint consists of three counts. First, as against all defendants, the plaintiff claims that the defendants interfered with and retaliated against her because of the exercise of her rights

---

v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)).  Therefore, the court, as the parties have done, will consider both claims together.  Cf. Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 761 n.6 (3d Cir. 2004).

under the FMLA.  Second, as against defendants Verizon, the plaintiff claims that the defendants discriminated against her on the basis on her disability in violation of her rights under the ADA and the PHRA, retaliated against her for the exercise of her rights under the ADA and the PHRA in violation of those acts, and failed to accommodate her disability.  She also raises a disparate-impact discrimination claim, claiming that defendants Verizon's absence policy disparately impacts "persons requiring time off due to sickness/disability." (Doc. No. 24 ¶ 66.)  Finally, as against all defendants, the plaintiff claims that the defendants violated the ERISA by failing to provide "notice and opportunity for" short- or long-term disability leave instead of terminating her and failing to produce documents that she requested.[2]  (Doc. No. 24 ¶ 87.)

On April 28, 2006, the defendants moved for summary judgment.  (Doc. No. 58.)  They submitted a statement of facts and exhibits on April 28.  (Doc. Nos. 59-65.)  They submitted a brief in support of the motion on May 12. (Doc. No. 92.)  On May 18, the plaintiff filed a brief in opposition to the

---

[2]The court has had some difficulty in discerning the precise nature of the remaining ERISA claims because of their presentation in the amended complaint.  The court has bolstered its reading of the complaint with the statement of the claims by the defendants in their motion for summary judgment, which purports to address all the remaining ERISA claims, and the plaintiff in her brief in opposition, which the court presumes presents the plaintiff's views as to her claims in light of the defendants' arguments. The plaintiff has also raised the ERISA claim in her motion for summary judgment, but solely on the ground that the defendants failed to disclose requested records.

defendants' motion and an answer to their statement of facts.  (Doc. Nos. 98 & 99.)  On June 2, the defendants filed a reply brief.  (Doc. No. 105.)

In their motion, the defendants raise eight arguments.  First, they contend that there is no genuine dispute of material fact as to the plaintiff's FMLA interference claims. Second, they contend that the plaintiff cannot establish a prima facie case of retaliation in violation of the FMLA or, assuming a prima facie case, that the defendants' proffered legitimate, non-discriminatory reason for terminating her was pretextual. Third, the defendants contend that, under an ADA disparate-treatment analysis, the plaintiff cannot establish a prima facie case of discrimination or, assuming a prima facie case, that the defendants' proffered legitimate, non-discriminatory reason for terminating her was pretextual.  Fourth, the defendants contend that the plaintiff cannot establish a prima facie case of the defendants' failing to accommodate her disability.  Fifth, the defendants contend that, under an ADA disparate-impact analysis, the plaintiff cannot establish a prima facie case of discrimination under the ADA.  Sixth, the defendants contend that the plaintiff cannot establish a prima facie case of retaliation under the ADA or, assuming a prima facie case, that the defendants' proffered legitimate, non-discriminatory reason for terminating her was pretextually retaliatory. Seventh, the defendants contend that the plaintiff cannot establish a genuine issue of material fact as to her ERISA claim.  Finally, the defendants contend that, because the plaintiff cannot establish a violation of the FMLA, the

4

individual-liability FMLA claim against defendant Sanders fails.  (Doc. No. 92.)

On April 28, the plaintiff moved for summary judgment.  (Doc. No. 67.) Also on that day, she submitted a statement of undisputed facts, exhibits, and a brief in support of her motion. (Doc. Nos. 69-81.) On May 15, the defendants filed a brief in opposition to the plaintiff's motion and an answer to the plaintiff's statement of facts.  (Doc. Nos. 95 & 96.)  On May 26, the plaintiff filed a reply brief.  (Doc. No. 103.)

In her motion, the plaintiff raises four arguments. First, the plaintiff contends that the defendants recklessly interfered with her rights under the FMLA.  Second, the plaintiff contends that the defendants discharged her in retaliation for exercising her rights under the FMLA. Third, the plaintiff contends that the defendants refused to accommodate her disability and discharged her in violation of the ADA and PHRA.  Finally, the plaintiff contends that the defendants failed to disclose to the plaintiff her medical records in violation of the ERISA.  (Doc. No. 81.)

The motions having been fully briefed, they are ripe for disposition, and the court will consider the parties' arguments on their merits.  The court has original jurisdiction over the plaintiff's Federal claims under 28 U.S.C. § 1331 and pendant jurisdiction over the plaintiff's PHRA claim under 28 U.S.C. §1367.

## II.    Standard of Review

Summary judgment is appropriate when the pleadings and any supporting materials show that there are no material issues of fact to be resolved and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); see Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).  Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Furthermore, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Id. at 324; Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990); Pastore v. Bell Tel. Co. of Pennsylvania, 24 F.3d 508, 511 (3d Cir. 1994) (quoting Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992)).  The party moving for summary judgment bears the burden of showing the absence of a genuine issue of any material fact, but the nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in the pleadings.  Celotex Corp., 477 U.S. at 323, 325; Anderson v. Liberty Lobby, Inc., 477 U.S. 248-52 (1986); Young  v. Quinlan, 960 F.2d 351, 357

6

(3d Cir. 1992).

To determine whether the nonmoving party has met its burden, the court must focus on both the genuineness and the materiality of the factual issues raised by the nonmovant.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 242, 247-48 (emphasis in original).  A dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  Anderson, 477 U.S. at 250.  A disputed fact is material when it could affect the outcome of the suit under the governing substantive law. Anderson, 477 U.S. at 248. If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).   All inferences, however, "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Pastore, 24 F.3d at 512 (quoting Big Apple BMW, Inc. v. BMW of N. America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992)).

## III.    Factual Background

With the standard for summary judgment in mind, the court has compiled from the parties' statements and counter-statements of facts (Doc. Nos. 59, 69, 96, & 98) and, as necessary, the evidence on which they are based, the following pertinent factual background to the case. Because the court confronts cross-motions for summary judgment, it accepts as undisputed and true any facts agreed upon by both the plaintiff and defendants or not controverted by the opposing party. The court notes any factual disputes between the parties by presenting both parties' contentions and appropriately applies the standard for summary judgment with respect to the nonmoving party's proffered, disputed facts in analyzing the moving party's motion.

The Plaintiff began working for defendants Verizon in 1996 and voluntarily resigned in August 2000. (Doc. Nos. 69 ¶ 4 & 59 ¶ 1.) On March 5, 2001, the plaintiff returned to defendants Verizon's employ. (Doc. Nos. 59 ¶ 2 & 69 ¶ 5.) The plaintiff's prior service was not credited to her when she returned to defendants Verizon in 2001, but the plaintiff contends that she had been promised otherwise and was entitled to the prior service credit. (Doc. Nos. 59 ¶ 5 & 98 ¶ 5.) While she worked at defendants Verizon, defendant Sanders was a force, or absence, administrator, responsible for attendance. (Doc. Nos.59 ¶ 29 & 69 ¶¶ 31-32.)

At the time the plaintiff was employed by defendants Verizon, they

8

utilized a Regional Attendance Plan ("RAP"), or Regional Associate Attendance Guideline, to govern employee absences.  (Doc. No. 69 ¶ 16.) They had a five-step RAP for employees with five or more years of credited employment and another four-step RAP for employees with between six months and five years of credited service.  (Doc. Nos. 59 ¶ 15 & 69 ¶ 16.) The defendants contend that the plaintiff was governed by the six-months-to-five-years RAP, whereas the plaintiff contends that she was governed by the more-than-five-years RAP.  (Doc. Nos. 59 ¶¶ 15 & 16 & 98 ¶¶ 15 & 16.) Under the RAP, unexcused incidents of absences or tardiness are charged to an employee's record and may lead to disciplinary action.  An incident is any single period of absence or tardiness regardless of the number of days. (Doc. No. 59 ¶¶ 7 & 9-10.)  Certified FMLA leave is not chargeable to an employee's attendance record.  (Doc. Nos. 69 ¶ 17 & 59 ¶ 8.)

The plaintiff claims that application of the RAP is discretionary, but the defendants argue it is only discretionary to the extent that a supervisor has flexibility in placing or advancing an employee on the RAP and "administer[s] the RAP in a consistent manner."  (Doc. Nos. 59 ¶ 28, 69 ¶ 23, & 96 ¶ 23.) When an employee violated the RAP, she was issued a step letter indicating that she was raised a step in the RAP plan.  If no further violations occurred within six months, the employer would be reduced a step.  If further violations occurred, the employee would be advanced to the next step. At the penultimate or ultimate step, the employee could be suspended. At the

9

ultimate step, the employee could be terminated.[3]  (Doc. Nos. 59 ¶¶ 16-27, 61 ex. D.)  Defendants Verizon were required to provide the employee with a copy of the step letter, In fact, the step letters themselves contain the following language "...[i]t is required that a copy of this entry be provided to the employee if the entry is intended to be used against the employee at some time to justify discipline."  (Doc. No. 69 ¶¶ 47-48.)  In fulfillment of this requirement, the plaintiff states that another employee who had been discharged under the six-months-to-five-years RAP was rehired because the defendants had made an error in the step-two step letter.  (Doc. No. 69 ¶ 28.)

In addition, defendants Verizon provided a Sickness and Accident Disability Benefits Plan ("SADBP"), which provided benefits to an employee who was absent because of illness or a work- or non-work- related injury. (Doc. Nos. 69 ¶ 18 & 96 ¶ 18.)  The SADBP also provided that an employee could receive long-term disability benefits after being disabled for fifty-two weeks.  (Doc. No. 69 ex. 4 at 83-85.)  An employee covered under the SADBP could receive benefits on the eighth consecutive day of absence. (Doc. No. 69 ¶ 19.)

Leave under the FMLA and the SADBP could run concurrently, in which case it was not chargeable under the RAP.  (Doc. No. 69 ¶ 20.)  However,

---

[3]The plaintiff does not contest the RAP as published, but contends, in support of her disparate-impact claim, that defendant Sanders discriminatorily applied the RAP with respect to employees with "medical/disability problems." (Doc. No. 98 ¶¶ 16-27.)

SADBP leave that was not also FMLA leave was chargeable.  (Doc. No. 59 ¶ 11.)  Defendants Verizon's Rap policy stated as an example of chargeable absence "non-FMLA covered sickness and disability absences."[4]  (Doc. No. 61 ex. D at 2.)

At the time she was rehired, the plaintiff was not on any step of the RAP.  (Doc. No. 59 ¶ 30.)  In April 2001, the plaintiff had two incidents of non-FMLA leave, for which she was placed on step one of the RAP on April 30.  (Doc. No. 59 ¶¶ 31 & 33.)  The plaintiff was absent from September 10

---

[4]The plaintiff contests this and argues that absences under the SADBP are not chargeable under the RAP even if they are not FMLA covered.  (Doc. Nos. 69 ¶ 21 & 98 ¶ 11.)  The court cannot credit the plaintiff's assertions and will accept the defendants' statement.  The evidence relied on by the plaintiff to support her claim is inapposite, and the plaintiff's attempt to support her claim on this evidence appears disingenuous.  First, the plaintiff cites to a portion of one deposition transcript in which the deponent, as the plaintiff properly acknowledges, does not know whether non-FMLA SADBP leave is chargeable.  Second, the plaintiff cites to the union steward's deposition as standing for the proposition that "SADBP is [a] paid non-chargeable absence." (Doc. Nos. 69 ¶ 21 & 98 ¶ 11.)  But the cited testimony does not at all support the statement.  The testimony, in fact, reads thusly:

    Q.    Okay.  Verizon gives sick and accident benefits, short-term disability benefits?

    A.    If you're out so many days, you go on disability.

    Q.    Okay.  The time that you're off on approved disability leave, that should not count against you in the RAP system?

        . . .

    Q.    Is that your understanding?

    A.    My understanding of–if it's–if it's approved by FMLA, they can't use it.

    Q.    And if they did use it, that would be interfering with someone's rights under the FMLA?

    A.    If it were FMLA approved and it was used, according to my understanding of the FMLA laws, yes, it would be.

(Doc. No. 73 at 27.)

through 12, because of which she was advanced to step two of the RAP. (Doc. No. 59 ¶¶ 35-36.)  On October 31, 2001, the plaintiff was absent from work.  As a result, the defendants extended the date on which the plaintiff would be reduced to step one to May 1, 2002, from March 22, 2002.  (Doc. No. 59 ¶¶ 37 & 39.)  In March 2002, the plaintiff became eligible for FMLA leave.  (Doc. No. 40.)  On March 22, 2002, the plaintiff received one day of FMLA leave.  (Doc. No. 69 ¶¶ 9 & 99.)  On May 1, the plaintiff was reduced to step one of the RAP.  (Doc. No. 59 ¶ 42.)

In May 2002, the plaintiff first experienced and sought treatment for various medical problems.  On May 2, the plaintiff took leave, which lasted through August 4, and requested that it be considered FMLA leave.  (Doc. Nos. 59 ¶ 43 & 69 ¶ 24.)  The period of leave from May 2 through June 30 was for stress and headaches, which were later diagnosed as syringohydromyelia and cervical radiculopathy.[5]  (Doc. Nos. 59 ¶ 44, 69 ¶ 25, 96 ¶ 25, & 98 ¶ 44.)  The plaintiff's supervisor knew that the plaintiff needed leave for "child care and personal medical reasons."  (Doc. No. 69 ¶ 36.)  The period of leave from July 1 through August 4 was for surgery.  The defendants approved it as FMLA and SADBP leave.  (Doc. Nos. 59 ¶¶ 45-46 & 69 ¶¶ 42 & 102.)

---

[5]Syringohydromyelia is "[a] chronic progressive disease of the spinal cord characterized by the development of cavities and gliosis of surrounding tissue."  See TABER'S CYCLOPEDIC MEDICAL DICTIONARY 1937 (Clayton L. Thomas, ed., 17th ed.  1993).  Cervical radiculopathy is a disease of the vertebral nerves in the neck.  See id. at 354 & 1665

In early July, the plaintiff was informed that her request for FMLA leave for the first period of leave was denied because she had failed to submit FMLA certification by May 28.  (Doc. Nos. 69 ¶¶ 38, 41, & 100 & 96 ¶ 38.)  The plaintiff contested the denial of FMLA leave.  (Doc. No. 69 ¶ 39.)  According to the plaintiff, it was denied because the FMLA form was not submitted by June 25. (Doc. No. 69 ¶¶ 40 & 100.)  The plaintiff contends that she informed Core that her doctor, not she, had failed to timely submit the certification.  (Doc. No. 69 ¶ 39.)  According to the defendants, the plaintiff never informed Core that her doctor was responsible for the failure.  They also contend that leave was denied because the plaintiff had not submitted additional information as requested in a letter sent to her on May 31.  (Doc. No. 96 ¶¶ 39 & 41.)  The plaintiff claims that defendants Verizon "promised Plaintiff that if she submitted the form by 6/25/02 the leave would be approved," which alleged promise the defendants deny.  (Doc. Nos. 69 ¶ 40 & 96 ¶ 40.)  The form was submitted on June 25, but, according to the defendants, was incomplete.  (Doc. Nos. 69 ¶¶ 40 & 101 & 96 ¶¶ 40 & 101.)  The plaintiff's request for SADBP leave for the first period of leave was also denied.  (Doc. No. 59 ¶ 47.)

The plaintiff returned to work on August 5.  Defendant Sanders issued her a step letter, which indicated that she was being elevated to step two of the RAP because of her chargeable absence between May 2 and June 30. (Doc. Nos. 59 ¶ 50, 69 ¶ 44, & 96 ¶ 44.)  The plaintiff contends that at the

time she was issued the step letter, her contest of the FMLA leave denial remained "open" on appeal. (Doc. No. 69 ¶ 46.)   The defendants contend that the plaintiff's denial was not open as of August 7.  (Doc. No. 96 ¶ 46.)

The plaintiff was absent from September 17 through September 19 to care for her sick daughter, for which she requested FMLA leave.  Her FMLA request was denied because she did not submit the FMLA certification form. (Doc. Nos. 59 ¶ 51 & 69 ¶¶ 51-52.)  According to the plaintiff, her physician faxed a letter to Core, stating that the failure to timely submit the certification was his fault. The defendants contend the letter was not sent to Core, but rather to the Geisinger Health System.  (Doc. Nos. 69 ¶ 53 & 96 ¶ 53.)  On September 30, the plaintiff left work for an 11:45 A.M. doctor's appointment. The physician told the plaintiff not to return to work.  According to the plaintiff, she called work and was told by defendant Sanders that her absence would not be charged against her.  (Doc. No. 69 ¶ 55.) According to the defendants, defendant Sanders does not recall the alleged conversation and the absence was not FMLA eligible.  (Doc. Nos. 59 ¶ 52 & 96 ¶ 55.)  The plaintiff was also absent between October 8 and October 11, which was not approved as FMLA leave.  (Doc. No. 59 ¶ 53.)

On October 17, defendants Verizon prepared a step letter to the plaintiff in which she was advanced to step three of the RAP because of her absence on September 17 through September 19.  The plaintiff was suspended without pay for three days.  (Doc. Nos. 59 ¶ 54 & 69 ¶ 56.)  The plaintiff contends that

the defendants wrongfully advanced her to step three because the FMLA denial was on appeal.  She further contends that defendant Sanders agreed on October 30 to remove the step letter from the plaintiff's file.  (Doc. No. 98 ¶ 54.)

On October 17, the plaintiff filed a complaint with the U.S. Department of Labor ("DOL") concerning defendants Verizon's denying the plaintiff's FMLA request for May 2 through June 30.  (Doc. No. 69 ¶ 62.)  The plaintiff's union also contested the October 17 step letter and, through the union steward, argued that neither the union nor the plaintiff received the step letter.  (Doc. No. 69 ¶¶ 64 & 98.)  The plaintiff also contends that defendant Sanders promised the plaintiff and the union steward on October 30 to remove the October 17 step letter from the her file.  (Doc. No. 69 ¶ 98.)  The defendants deny that the plaintiff did not receive a copy of the step letter or that defendant Sanders promised to removed the letter.  (Doc. No. 96 ¶¶ 64 & 98.)

On October 18, the plaintiff took a leave of absence that lasted through January 19, 2003.  (Doc. No. 59 ¶ 56.)  She needed the leave because she suffered from "chronic daily headache or rebound headache in the setting of common migraine, with a contribution of neuromuscular headache probably associated with cervical spine problems" of unknown etiology, which was the same condition that had required the plaintiff's leave of absence in May 2002.  (Doc. No. 69 ¶¶ 72-73.)  The defendants initially approved the leave as FMLA leave on November 13.  (Doc. Nos. 59 ¶ 57 & 69 ¶ 68.)  In letters dated

15

November 12, 2002, December 16, 2002, and February 6, 2003, they also granted the plaintiff SADBP benefits from October 25, 2002, through February 9, 2003.  (Doc. Nos. 59 ¶ 58 & 69 ¶ 69.)

On January 6, 2003, the DOL, after discussions with defendants Verizon, informed the plaintiff of the result of its investigation into the plaintiff's complaint, and, on January 8, the DOL complaint was settled and closed.[6] (Doc. Nos. 59 ¶ 59 & 69 ¶¶ 75-76.)  The DOL found that defendants Verizon had violated the plaintiff's rights under the FMLA.  (Doc. Nos. 63 ex. S & 69 ¶ 75.)  As a result, the defendants retroactively approved the May 2 through June 30 absence for FMLA coverage.  (Doc. No. 59 ¶ 59.)  The DOL recognized that "[d]ue to Ms. Mitrow's continued need for leave, she subsequently exhausted her FMLA leave entitlement by 7/24/02 . . . ." (Doc. Nos. 59 ¶ 59 & 63 ex. S.)  The case file also states that the plaintiff was informed of the exhaustion of her FMLA leave and that, because of the exhaustion of her FMLA benefits as of July 24, she would receive a step letter for her absences after that date.  (Doc. Nos. 59 ¶ 60 & 63 ex. S.)

The plaintiff contends that the DOL informed her that the "worst that would happen is she would be placed on Step 3 of the RAP and suspended" and that the DOL and defendants Verizon agreed to this.  (Doc. No. 69 ¶¶ 76-

---

[6]The defendants use the term "conciliated," but the plaintiff objects to its use on the grounds that the DOJ found that defendants Verizon had violated the FMLA.  (Doc. Nos. 59 ¶ 59 & 98 ¶ 58.)  The dispute is not pertinent here, and the court will use the term "settle" as a compromise.

77.)  The defendants deny this contention and note that there is no evidence for it in the record except for the plaintiff's statement.  (Doc. No. 96 ¶ 75-76.) In addition, even though the plaintiff acknowledges that she received the DOL's case file, she contends that her FMLA leave was only exhausted on November 15, 2002, and that she did not receive notice of its exhaustion. (Doc. No. 98 ¶¶ 59-61.)

Defendant Sanders readjusted the August 5 step letter to reflect the DOL settlement.  (Doc. Nos. 59 ¶ 61 & 69 ¶ 45.)  However, he failed to provide the plaintiff with a copy of the readjusted step letter before the plaintiff's termination.  (Doc. No. 69 ¶ 49.)  Likewise, the plaintiff was not provided with the original or readjusted October 17 step letters, although her union was given a copy of the readjusted letter.  (Doc. No. 69 ¶¶ 49 & 61.)

The record indicates that defendants Verizon calculated the plaintiff's attendance record on January 13.  According to an individual attendance report prepared on January 13, 2003, which readjusts the plaintiff's attendance record to effectuate the DOL settlement, the plaintiff was on step one of the RAP as of May 1; she exhausted her FMLA entitlement on July 23, 2002; the basis of the August 5 step-two letter was changed to the absence from July 24 to August 4, which had originally been granted as FMLA leave, from the FMLA absence between May 2 and June 30, which had originally been denied; the basis of the October 17 step-three letter remained the absence from September 17 to September 19.  (Doc. No. 63 ex. T.)  The

report also indicates that the plaintiff was not issued a step letter for the chargeable absences on September 30, from October 8 to October 11, or from October 18 to December 31. (Doc. No. 63 ex. T.) However, a modified attendance report prepared on March 25 indicates that a step-four letter, issued on January 20, led to the plaintiff's termination and was based on the absences on September 30, from October 8 to October 11, and from October 18 to December 31. (Doc. No. 63 ex. T.)

According to the plaintiff, she spoke with defendant Sanders on January 13, 2003, to inform him that she could return to work on January 20 and he faxed her a return to work schedule. (Doc. No. 69 ¶¶ 78-79.) The defendants deny the plaintiff's claims on the grounds that defendant Sanders does not recall the conversation or the fax. (Doc. No. 96 ¶¶ 78-79.) On January 17, 2003, the plaintiff faxed a letter to defendant Sanders from her doctor indicating that she could return to work on January 20 with various accommodations, including "an orthopedic chair, hourly changes of position for 5-10 minutes, no overtime, and desk work days when plaintiff had sever pain."[7] (Doc. Nos. 59 ¶ 64 & 69 ¶ 81.) Defendants Verizon was willing and able to accommodate the plaintiff. (Doc. No. 59 ¶ 66.)

When the plaintiff returned to work on January 20, she was told to report to defendant Sanders office. At defendant Sanders's office, the plaintiff was

---

[7]The plaintiff's letter, which the defendants do not dispute, refers to her receiving the schedule that the defendants deny having faxed her. (Doc. Nos. 69 ¶ 81 & 96 ¶ 81.)

terminated because of her excessive absences.  (Doc. Nos. 59 ¶ 65 & 69 ¶¶ 83-84.)  The defendants contend that the plaintiff was told that her absence from October 18 through January 19 was chargeable under the RAP, which led to her being placed on step four and her termination.  (Doc. No. 59 ¶ 65.) The plaintiff contends that she was wrongly terminated because she was on the five-step RAP, not the four-step RAP.  She also contends that defendant Sanders never specified the dates.  (Doc. No. 98 ¶ 65.)  In addition, the plaintiff states that when she questioned him about the DOL findings, he may have replied "I don't care."  (Doc. No. 69 ¶ 22.)  There were three or four versions of the January 20 step letter.  The defendants did not provide a copy of any of the versions of the January 20 step letter, which was the basis of the plaintiff's termination, to the plaintiff, according to them because she walked out of the meeting before defendant Sanders could give her a copy. Defendant Sanders subsequently failed to mail it to her.  (Doc. Nos. 69 ¶¶ 50 & 93-95 & 96 ¶ 95.)  At the time she was terminated, the defendants did not discuss with the plaintiff the option of allowing her to continue on short-term disability benefits, not to return to work or take long-term disability.  (Doc. No. 69 ¶ 158 & ex. 12 at 210:14-24.)

After she was terminated, the defendants informed the plaintiff "that her SADBP benefits were approved for the period 10/25/02 through 01/19/03 with a return to work date, with restrictions, of 1/20/03."  (Doc. No. 69 ¶ 70.)  The

plaintiff received SADBP benefits through January 18.[8]  (Doc. Nos. 69 ex. 6 at 4 & 96 ¶ 71.)  On January 29, Core sent the plaintiff a letter informing the plaintiff that her May 2 through July 23 leave was approved as FMLA leave and would count towards her sixty-day FMLA entitlement.  The letter stated that the leave period would not be chargeable under the RAP unless it exceeded the plaintiff's remaining FMLA entitlement.  It also stated that the plaintiff's FMLA entitlement had ended on July 23, 2002. (Doc. No. 59 ¶¶ 67 & 68.)

The plaintiff also contends that defendant Sanders inconsistently applied the RAP.  (Doc. No. 69 ¶¶ 132-35 & 138.)  According to the record, the union steward testified in a deposition that the "buzz" was that defendant Sanders favored some people over others on the basis of their reasons for being absent.  (Doc. No. 70 at 32:2-43:3.)  He mentioned several people who supposedly were unhappy with defendant Sanders's application of the RAP. (Doc. No. 70 at 32:2-43:3.)  The defendants deny the contentions and note that the evidence is solely based on speculation and gossip.  (Doc. No. 96 ¶¶ 132-35 & 138.)

---

[8]Again, the plaintiff has attempted to support a claim of fact with evidence that does not bear out her contention.  In her statement of facts, the plaintiff contends that she was paid SADBP from October 25, 2002, through January 24, 2003.  (Doc. No. 69 ¶ 71.)  The plaintiff cites to the defendants' answers to interrogatories.  Interrogatory ten states, "Plaintiff was paid SADBP for the period October 25, 2002, through January 10, 2003."  (Doc. No. 69 ex. 6 at 4.)  The defendants' response states, "Denied.  Defendant was paid SADBP for the period of October 25, 2002, through the pay period ending January 18, 2003."  (Doc. No. 69 ex. 6 at 4.)  Consequently, the court will accept the defendants' statement.

## IV.    Discussion

### A.    The ADA & The PHRA

The ADA provides, in part, that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[9]  42 U.S.C. § 12112(a). There are two cognizable theories of liability under the ADA, as for most types of discrimination claims.  Raytheon Co. v. Hernandez, 540 U.S. 44, 52, 53 (2003) (citing 42 U.S.C. § 12112(b)).  First, there is the disparate-treatment theory of discrimination.  The Supreme Court has stated that "'[d]isparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or [other protected characteristic].'" Id. (quoting Teamsters v. United States, 431 U.S. 324, 335, n. 15 (1977) (brackets and omissions in original).    Second, there is the disparate-impact theory. "[D]isparate-impact claims 'involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" Id. (quoting Teamsters, 431 U.S. at 335-36 n.15).  A court must beware of

---

[9]A "covered entity" is "an employer, employment agency, labor organization, or joint labor-management committee."  42 U.S.C. § 12111(2). The parties do not dispute that the defendant is a "covered entity."

confusing the two theories "[b]ecause 'the factual issues, and therefore the character of the evidence presented, differ when the plaintiff claims that a facially neutral employment policy has a discriminatory impact on protected classes . . . ." Id. at 53 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252 n.5 (1981)).

Under the disparate-treatment theory, an employer violates the ADA if it is "'actually motivated'" to discriminate against an employee on the basis of the employee's disability and the disability had a "determinative influence" on the discriminatory action. Hazen Paper Co., 507 U.S. at 610; see Raytheon, 540 U.S. at 52; Watson v. Southeastern Pennsylvania Transp. Auth., 207 F.3d 207, 214-15 (3d Cir. 2000). In reviewing a motion for summary judgment to determine if there is a genuine issue of material fact concerning whether an employer illegally discriminated against an employee, the court applies the test articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and refined in Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Raytheon, 540 U.S. at 49 n.3; Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (citing Walton v. Mental Health Ass'n. of Southeastern Pennsylvania, 168 F.3d 661, 667-68 (3d Cir. 1999); Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997); Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 156-58 (3d Cir. 1995). The McDonnell Douglas test "establishe[s] an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-

treatment cases."[10]  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)) (internal omission in original).

To succeed on an ADA disparate-treatment claim under the McDonnell Douglas test, the plaintiff must establish by a preponderance of the evidence a prima facie case of discrimination.  St. Mary's Honor Ctr., 509 U.S. at 506; Burdine, 450 U.S. at 252-53.  A prima facie case requires the plaintiff to prove three elements.  First, the plaintiff must establish that she is disabled within the meaning of the ADA.  Turner, 440 F.3d at 611 (citing Buskirk v. Apollo Metals, 307 F.3d 160, 166 (3d Cir. 2002)); Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998)).  Under the ADA, a "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," 42 U.S.C. § 12102(2)(A), "a record of such an impairment," id. § 12102(2)(B), or "being regarded as having such an impairment," id. 12102(2)(C).

The threshold to be considered disabled under the ADA is high.  Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 197 (2002).  Under 42 U.S.C. §12102(2)(A), the major life activity pertinent to this case is "performing manual tasks."  29 C.F.R. § 1630.2(I) (2006); see Toyota Motor Mfg., 534 U.S. at 195.  "[T]o be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely

---

[10]The burden of persuasion always remains upon the plaintiff.  Reeves, 530 U.S. at 143 (citing Burdine, 450 U.S. at 254).

restricts the individual from doing activities that are of central importance to most people's daily lives." Toyota Motor Mfg., 534 U.S. at 198; see 29 C.F.R. § 1630.2(j).  Furthermore, "[t]he impairment's impact must also be permanent or long term." Id.; see 29 C.F.R. § 1630.2(j)(2)(ii)-(iii).  "As a matter of law, a 'transient, nonpermanent condition,' McDonald v. Commonwealth, 62 F.3d 92, 94-97 (3d Cir. 1995), or 'a temporary, non-chronic impairment of short duration,' Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380 (3d Cir. 2002), . . . fall short of substantially limiting an individual in a major life activity." Williams, 380 F.3d at 765.  The court must evaluate the circumstances of the impairment to determine if it substantially limits the performance of manual tasks.  Id.; see 29 C.F.R. § 1630.2(j)(2) (listing three factors a court should consider in evaluation).  Under 42 U.S.C. § 12102(2)B), an individual has a record of impairment if she "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  29 C.F.R. § 1630.2(k).  Finally, under 42 U.S.C. §12102(2)(C), an individual is considered disabled if, regardless of whether she has a substantially limiting physical impairment, she is treated as though she has a qualifying disability.  29 C.F.R. § 1630.2(l).

Second, the employee must establish that she is a qualified individual within the meaning of the ADA.  Turner, 440 F.3d at 611 (citing Buskirk, 307 F.3d at 166; Gaul, 134 F.3d at 580).  A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform

the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8).   "Essential functions" means "the fundamental job duties of the employment position the individual with a disability holds or desires."  29 C.F.R. § 1630.2(n)(1); see id. § 1630.2(n)(2), (3) (discussing criteria by which to determine essentiality).   "Reasonable accommodation," as pertinent here, requires an employer to make "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." Id. § 630.2(o)(2).  It includes restructuring the employee's job or modifying the employee's work schedule to enable the employee to continue working with her disability.  Id. § 1630.2(o)(2)(ii); see "Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act," 29 C.F.R. pt. 1630, app. ("In general, an accommodation is any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities.").  An extended leave of absence may also be a reasonable accommodation under certain circumstances, but not if it is open-ended and indefinite. Id. pt. 1630, app.; Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 151 (3d Cir. 2004) ("[T]he federal courts that have permitted a leave of absence as a reasonable accommodation under the ADA have reasoned, explicitly or implicitly, that applying such a reasonable

accommodation at the present time would enable the employee to perform his essential job functions in the <u>near</u> future.") (emphasis added) (citing <u>Criado v. IBM Corp.</u>, 145 F.3d 437, 444 (1st Cir. 1998)); Walton, 168 F.3d 670-71; <u>see</u> <u>Fogleman v. Greater Hazleton Health Alliance</u>, 122 Fed.Appx. 581, 585 (3d Cir. 2004) (not precedential) ("There is no evidence that permits any conclusion other than that the requested leave was for an indefinite and open-ended period of time. This does not constitute a reasonable accommodation.") (citing <u>Rascon v. U.S. W. Communications, Inc.</u>, 143 F.3d 1324, 1334 (10th Cir. 1998); <u>Peter v. Lincoln Tech. Inst.</u>, 255 F.Supp.2d 417, 437 (E.D. Pa.2002); <u>Shafnisky v. Bell Atl., Inc.</u>, 2002 WL 31513551, *11 (E.D. Pa. Nov. 5, 2002) (not reported)).

Finally, the plaintiff must establish that she has suffered an "adverse employment decision as a result of discrimination." <u>Turner</u>, 440 F.3d at 611 (citing <u>Buskirk</u>, 307 F.3d at 166; <u>Gaul</u>, 134 F.3d at 580). An "adverse employment decision" includes an employer's failure to accommodate, reasonably, the employee's disability. <u>Williams</u>, 380 F.3d at 761 (citing <u>Taylor</u>, 184 F.3d at 306).

If the plaintiff makes her <u>prima</u> <u>facie</u> showing, there is a presumption of discrimination. <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 506 (citing <u>Burdine</u>, 450 U.S. at 254). The burden then shifts to the defendant to rebut the presumption by "produc[ing] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." <u>Reeves</u>, 530 U.S. at

142 (citing <u>Burdine</u>, 450 U.S. at 254). The defendant's burden is "relatively light." <u>Tomasso v. Boeing Co.</u>, 445 F.3d 702, 706 (2006) (citing <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994)). If the defendant produces evidence of a nondiscriminatory reason for the challenged conduct, the presumption "drops from the case." <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 507 (quoting <u>Burdine</u>, 450 U.S. at 255).

The burden of production then returns to the plaintiff to demonstrate by a preponderance of the evidence that the defendant's proffered reason is pretextual and "unworthy of credence." <u>Reeves</u>, 530 U.S. at 143 (quoting <u>Burdine</u>, 450 U.S. at 256). To show that the defendant's rationale is pretextual, the plaintiff must adduce evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Tomasso</u>, 445 F.3d at 706 (quoting <u>Fuentes</u>, 32 F.3d at 764). It is not enough for the plaintiff to show that the defendant was "'wrong or mistaken'" in his action. <u>Id.</u> (quoting <u>Fuentes</u>, 32 F.3d at 764). Rather, to defeat summary judgment, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." <u>Fuentes</u>, 32 F.3d at 765

(internal quotations and citation omitted) (bracketed material in original) (citing Josey v. John TR. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993); Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 527, 531 (3d Cir. 1992), cert. denied, 510 U.S. 826 (1993); Chauhan v. M. Alfieri Co., Inc., 897 F.2d 123, 128 (3d Cir. 1990)); see Tomasso, 445 F.3d at 706 (citing Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005); cf. id. at 704 ("First, [the plaintiff] has shown sufficient implausibilities and inconsistencies in [the defendant's] primary rationales to avoid summary judgment. Second, a rational factfinder could dismiss the secondary reasons as pretextual, not because they played no role in [the plaintiff's] layoff but because they cannot explain the layoff sufficiently.")).

Under the disparate-impact theory, an employer violates the ADA if it utilizes "practices that are fair in form, but discriminatory in operation." Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971). Consequently, intent is irrelevant to a disparate impact analysis. Id. at 432; see Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 987 (1988) ("[S]ome employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination."). But an employer may not be found liable on less evidence than is required to prove an intentional-discrimination claim. Watson, 487 U.S at 987. Consequently, a plaintiff's burden is heavier in a disparate-impact case than in a disparate treatment case. Massarsky v. Gen. Motors Corp., 706 F.2d 111, 120 (3d Cir. 1983).

A disparate-impact claim is analyzed under a similar framework as a disparate-treatment claim, which is taken from Title VII case law, except that the <u>prima</u> <u>facie</u> case entails different elements.  <u>See</u> <u>Cmty. Servs., Inc. v. Wind Gap Mun. Auth.</u>, 421 F.3d 170, 176 n.5 (3d Cir. 2005) ("When examining disparate impact claims under the . . . ADA , we use Title VII as a starting point.") (quoting <u>Tsombanidis v. W. Haven Fire Dep't</u>, 352 F.3d 565, 575 (2d Cir. 2003)).  To establish a <u>prima</u> <u>facie</u> case under the disparate-impact theory, the plaintiff must prove two elements.  First, the plaintiff must "identify the specific employment practice that allegedly has a disproportionate impact." <u>Armstrong v. Flowers Hosp., Inc.</u>, 33 F.3d 1308, 1314 (3d Cir. 1994) (citing <u>Watson</u>, 487 at 994).  Second, the plaintiff must show that this facially neutral employment practice "had a significantly discriminatory impact'" on a protected group. <u>Massarsky</u>, 706 F.2d at 120 (quoting <u>Connecticut v. Teal</u>, 457 U.S. 440, 446 (1982)).  This second element is causation, which is often proven by statistical analysis. <u>Watson</u>, 487 at 987, 994 ("The evidence in these 'disparate impact' cases usually focuses on statistical disparities . . . ."); <u>Armstrong</u>, 33 F.3d at 1314 ("Disparate impact cases typically focus on statistical disparities and on the various explanations for those disparities, rather than on specific incidents."). To prove causation, "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the" discrimination. <u>Watson</u>, 487 at 994; <u>Armstrong</u>, 33 F.3d at 1314.  "[S]tatistical

disparities must be sufficiently substantial that they raise such an inference of causation." Watson, 487 at 994.

In this case, the plaintiff cannot show that she was disparately treated in violation of the ADA.  The plaintiff raises two issues under the disparate-treatment theory: whether the defendants failed to accommodate the plaintiff and whether they otherwise discriminated against the plaintiff.  The court will only consider the prima facie case with respect to the plaintiff's claim that the defendants' discriminated against her by failing to accommodate her alleged disability.   The court will assume that the plaintiff is disabled and a qualified individual for the purpose of this claim.  Regardless of these assumptions, the plaintiff cannot establish that she suffered an adverse employment decision in violation of the ADA because of the defendants' refusal to accommodate the plaintiff. It is undisputed that the defendants were aware of the accommodations necessary to facilitate the plaintiff's return to work on January 20. It is also undisputed that the defendants were able to accommodate the plaintiff's needs and were willing to do so on January 20 because the plaintiff admitted the defendants' statement to this effect.  Thus, the court ineluctably finds that there is no controversy concerning whether the defendants failed to accommodate the plaintiff's alleged disability.

The court will assume that the plaintiff can establish a prima facie case of discrimination for the purpose of considering the general discrimination claim.  Regardless of a prima facie case, the defendants have produced a

legitimate, nondiscriminatory reason for terminating the plaintiff that she cannot rebut.  The defendants have produced substantial evidence that the plaintiff was terminated because of her frequent absences without regard to any alleged disability underlying those absences.  The plaintiff has failed to show that this evidence is pretextual or incredible. Indeed, there is no evidence in the record that indicates that the defendants considered her alleged disability except insofar as necessary to determine whether the plaintiff was eligible for FMLA or SADBP leave.  Thus, the court finds that it would be impossible for any reasonable factfinder, on the record here, to find that the defendants' proffered reason is weak, implausible, inconsistent, incoherent, or contradictory.

The plaintiff also cannot show that the defendants employed the RAP in such a way as to disparately impact the plaintiff and other disabled employees.  The plaintiff has established the first element by identifying the application of the RAP as the practice with the alleged disparate impact. However, the plaintiff cannot establish the second element because she has failed to produce any evidence to support her heavy burden in showing an inference of causation.  Instead of offering any statistical analyses to show that the defendants applied the RAP in a way that was effectively discriminatory, she has relied upon haphazard and mostly unsubstantiated evidence of isolated incidents of alleged disparate impact.  She has identified specifically only one instance in which the RAP was applied differently than

31

it was to her. This evidence is insufficient to allow any reasonable factfinder to find that the defendants' applied the RAP in a discriminatory manner.

Accordingly, the court recommends that the plaintiff's motion for summary judgment be denied with respect to her disparate-treatment and disparate-impact claims under the ADA and the PHRA, the defendants' motion for summary judgment be granted with respect to those claims, and the plaintiff's complaint be dismissed as against all defendants with respect to those claims.

## B.    The FMLA

The FMLA purports to balance an employer's legitimate interests with an employee's ability to take reasonable medical leave. 29 U.S.C. § 2601(b); see Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005). To accomplish its goal, the FMLA provides that an eligible employee "shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . because of a serious health condition that makes the employee unable to perform the functions of [her] position."[11]   29 U.S.C. § 2612(a)(1)(D); see Callison, 430 F.3d at 119. An employee is entitled to no more than twelve weeks of FMLA leave. Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81,

---

[11]The parties do not dispute that the plaintiff is an eligible employee as defined by 29 U.S.C. § 2611(2) or that defendants Verizon are employers covered by the FMLA as defined by 29 U.S.C. § 2611(4)(A). Defendants Verizon calculate FMLA leave on a calendar-year basis. (Doc. Nos. 69 ¶ 7 & 96 ¶ 7.)

93-94 (2002); 29 C.F.R. § 825.200(a).   After taking FMLA leave, "an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment." 29 C.F.R. § 825.214(a); see Callison, 430 F.3d at 119.   After the employee requests leave, the employer must, within a reasonable time, provide the employee with a "written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations," including whether the leave will be counted as FMLA leave and the employee's right to restoration.   Id. § 825.301(b)(1).   "In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee as provided in this section." Id. § 825.208.

The FMLA provides various protections for employees who are eligible for or have taken FMLA leave.   See 29 U.S.C. § 2615; 29; Callison, 430 F.3d at 120 ("The FMLA is meant to prohibit employers from retaliating against employees who exercise their rights, refusing to authorize leave, manipulating positions to avoid application of the Act, or discriminatorily applying policies to discourage employees from taking leave.") (citing 29 C.F.R. § 825.220). Under the "entitlement" or "interference" provision, it is illegal for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" under the FMLA.   29 U.S.C. § 2615(a)(1); see Callison, 430 F.3d

at 119; <u>Conoshenti</u>, 364 F.3d at 141-42; <u>Bearley</u>, 322 F.Supp.2d at 570-71.

"Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the" FMLA.  29 C.F.R. § 825.220(b).  Interfering with an employee's rights under the FMLA includes "refusing to authorize FMLA leave."  <u>Id.</u>  To establish a violation of the entitlement provision, an employee need only show that she was entitled to FMLA benefits, 29 U.S.C. § 2612(1), and the employer interfered with them, 29 U.S.C. § 2614(a)(1).  <u>Callison</u>, 430 F.3d at 119.  "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA."  <u>Id.</u> at 120.  Consequently, it is irrelevant whether the employer had a legitimate reason to deny the benefits or treated disparately or similarly other employees.[12]  <u>Id.</u> at 119-20.

Under the interference provision, an employee may recover for any prejudice suffered by the interference.  "The remedy is tailored to the harm suffered."  <u>Ragsdale</u>, 535 U.S. at 89 (<u>dictum</u>).  An employer who violates §2615 is liable to an employee "for damages equal to" either lost wages, benefits, and other compensation, or, where no wages, benefits, or other compensation was lost, "actual monetary losses sustained by the employee as a direct result of the violation," plus interest on the damages.  29 U.S.C. § 2617(A)(I), (ii).  If the employer's violation was not in good faith and

---

[12]This means the <u>McDonnell Douglas</u> burden-shifting test does not apply.

unreasonable, he is also liable for liquidated damages equal to the amount of damages plus interest.  Id. § 2617(A)(iii).  An employee may also seek equitable relief, including "employment, reinstatement, and promotion."  Id. §2617(B).

In this case, the court finds that the plaintiff has made a case for interference in violation of her FMLA rights.  The plaintiff raises two claims with respect to FMLA interference: whether the defendants interfered with her leave from May 2 to June 30 and whether the defendants interfered with her leave after July 24.  Neither party disputes the first element of an interference claim, whether the plaintiff was eligible for FMLA leave.  The court, therefore, will assume that element and consider only whether the defendants denied her a benefit to which she was entitled.  With respect to the first period, there is no question that the defendants denied the plaintiff's FMLA request.  The defendants argue that, despite their denial, they did not interfere with the plaintiff's FMLA rights because they subsequently granted her the leave as part of the DOL settlement. However, the court finds this argument unavailing. Under the case law, all that matters is that the defendants denied the plaintiff FMLA leave to which she was entitled.  It remains to be shown whether, or in what amount, the plaintiff was prejudiced.  The record before the court is unclear on that issue and poses a factual question that must be resolved by a jury. Accordingly, the court recommends that the plaintiff's motion for summary judgment be granted with respect to her claim of unlawful

interference with her FMLA rights arising from the denial of leave for the period from May 2 to June 30, the defendants' motion for summary judgment be denied on this claim, and the claim proceed to trial only for the purpose of determining damages under § 2617.

With respect to the second period of leave, the case is more complicated.  It is clear that, after the DOL settlement, the plaintiff's twelve weeks of FMLA leave were exhausted as of July 24.  The plaintiff's claims to the contrary notwithstanding, the record evidence shows that the defendants, the DOL, and the plaintiff were aware of this fact, and no factfinder could reasonably disbelieve the evidence on this point. The complication arises because this fact only arose in January 2003 and was used to retroactively withdraw approval for the plaintiff's FMLA leave from July 1 through August 4.  The court recognizes that the DOL settlement provided that the plaintiff would receive a step letter for the now-deauthorized FMLA leave.  However, such post-hoc punishment produces an anomalous, inequitable result contrary to the spirit of the FMLA.  When the plaintiff returned to work on January 20, 2003, she received in effect two RAP adjustments–the step two letter for the period July 24 through August 4, which essentially transferred the initial RAP advancement for the period May 2 through June 30 to this period, and the step four letter for the absences on September 30, October 8 through October 11, and October 18 through December 31. It appears that the defendants merely shifted the plaintiff's basis of punishment from the May

2 to June 30 period to the July 24 to August 4 period.  Thus, the retroactive redesignation of the July 24 through August 4 leave triggered a causal chain that led directly to the plaintiff's termination because it meant that she was at step four of the RAP when she returned to work.

The purpose of the FMLA is to allow an employee to balance her serious medical needs with her employer's productivity needs.  As reflected in the FMLA notice regulations, an employee who knows how much FMLA leave she has used, and has left, may plan future leave according to her remaining FMLA entitlement.  But where an employee only knows her FMLA leave entitlement after she has taken leave, she cannot balance her future need for leave.  In such a situation, it would be unfair to punish the employee.  The need to avoid an unjust result is especially warranted where, as here, the employer wrongly denied FMLA leave, the correction of which ultimately led to the retroactive redesignation of later leave.  However, on the record before it, in consideration of the plaintiff's serious and ongoing medical needs, the court cannot state with certainty that the plaintiff would have been able to reschedule her later leave to accommodate the result of the DOL settlement.  It should be left to a jury to determine whether, had the plaintiff known that she would have no FMLA after July 24, she could have scheduled her future leave needs to avoid the unjust punishment that she suffered.  Accordingly, the court recommends that the plaintiff's and the defendants' motions for summary judgment be denied with respect to her claim of unlawful

interference with her FMLA rights arising from the denial of leave for the period from July 24 to August 4 and the claim proceed to trial.

### C.   Retaliation in Violation of the ADA and the FMLA

The ADA and the FMLA prohibit an employer from retaliating against an employee because the employee exercised her rights under the statutes or "oppos[ed] any practice made unlawful by" them.  29 U.S.C. § 2615(a)(2), (b) (FMLA); 42 U.S.C. § 12203(a) (ADA); 29 C.F.R. § 825.220(c), (e) (FMLA); see  Williams, 380 F.3d at 758-59 (ADA); Conoshenti, 364 F.3d at 146 (FMLA).  A retaliation claim is analyzed under the McDonnell Douglas test, which is the same as described above except in the elements of a prima facie case.  To establish a prima facie case of retaliation in violation of the ADA or the FMLA, the plaintiff must prove three elements by a preponderance of the evidence.   First, the plaintiff must show that she engaged in an activity protected under either statute.  Williams, 380 F.3d at 759 (citing Fogleman v. Mercy Hosp., 283 F.3d 561, 567-68 (3d Cir. 2002)); Conoshenti, 364 F.3d at 146 (citing 29 C.F.R. § 825.220(c)).  As relevant to the plaintiff's claims here, seeking an accommodation is protected under the ADA, Williams, 380 F.3d at 759 n.2 (citing Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 191 (3d Cir. 2003)), and filing a complaint with the DOL is protected under the FMLA, 42 U.S.C. § 12203(a); 29 C.F.R. § 825.220(e).   Second, the plaintiff

must show that she suffered an adverse employment decision.[13]  Termination is an obvious adverse employment decision.  Finally, the plaintiff must show that the adverse decision was causally related to the exercise of her ADA or FMLA rights.  Williams, 380 F.3d at 759 (citing Fogleman v. Mercy Hosp., 283 F.3d 561, 567-68 (3d Cir. 2002)); Conoshenti, 364 F.3d at 146 (citing 29 C.F.R. § 825.220(c)).  "[T]emporal proximity between the protected activity and the termination [can be itself] sufficient to establish a causal link."  Williams, 380 F.3d at 760 (quoting Shellenberger, 318 F.3d at 183) (internal quotation omitted).  But the temporal proximity "must be unusually suggestive of retaliatory motive before a causal link will be inferred."  Id. (quoting Shellenberger, 318 F.3d at 189 n.9) (internal quotation omitted).  The Third Circuit has found that two days and ten days between the protected activity and the alleged retaliation sufficed to show cause.  Id. (citing Shellenberger, 318 F.3d at 189; Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)).

Here, the court finds that the plaintiff has failed to establish a claim for retaliation in violation of the ADA but has established a claim for retaliation in violation of the FMLA.  With respect to the ADA, the plaintiff can establish the

---

[13]The Supreme Court has held that whether there was an adverse employment decision is an inappropriate element of a retaliation claim in a Title VII case.  Burlington N. & Santa Fe Ry. Co. v. White, – U.S. –, 126 S.Ct. 2405, 2412-14 (2006).  Instead, the Court held that a plaintiff must show material adversity.  Id. at 2414-15.  The Court and the Third Circuit have not yet addressed the effect of White on non-Title VII cases, such as before the court here.  The court need not address its impact, however, because the challenged action in this case, termination, constitutes both an adverse employment decision and a materially adverse action, and, thus, the analysis of the retaliation claims is not affected.

first two elements–she requested an accommodation and suffered an adverse employment decision–but she cannot establish a causal connection. The plaintiff's retaliation claim is premised on the defendants' alleged refusal to accommodate her disability.  However, as discussed above, the defendants were willing and able to accommodate the plaintiff, a fact that she acknowledges.  Thus, there is no basis upon which any reasonable factfinder could find that the defendants terminated the plaintiff because she requested an accommodation. Accordingly, the court recommends that the plaintiff's motion for summary judgment be denied with respect to her claim of retaliation in violation of the ADA and the PHRA, the defendants' motion be granted with respect to this claim, and the plaintiff's complaint be dismissed as against all defendants with respect to this claim.

With respect to the FMLA retaliation claim, the plaintiff can establish all three elements.  She filed a DOL complaint, she was terminated, and there appears to be a causal connection between the two actions.  The plaintiff was terminated twelve days after the DOL reached final settlement of and closed its investigation into the plaintiff's complaint.  That twelfth day was the first day the plaintiff was back at work after the DOL settlement.  This time frame could appear to a factfinder to be unusually suggestive of a retaliatory motive.

The defendants have proffered a legitimate, nondiscriminatory reason for terminating the plaintiff: she had too many unprotected absences.  However, a reasonable factfinder could find that the evidence, even beyond

the temporally suggestive evidence, supports the plaintiff's contention that the defendants' reason is pretextual and incredible.  First, the plaintiff has shown that the defendants terminated her in violation of their procedures governing RAP discipline.  Although they were required to provide the plaintiff with the step letters before subjecting her to discipline, the defendants admit that they did not timely provide her with the step letters, and in at least one instance she did not receive the letter until after she was terminated. Second, the entire process in respect of the step letters and the plaintiff's discipline is confused and suspect because of the various versions that circulated and the alleged conflicting information between those versions and what the plaintiff contends she was told by defendant Sanders.  Third, the defendants admit that they rehired another employee whose step letter contained an error, but they refused to rehire the plaintiff in spite of their failure to follow their RAP procedures and the alleged errors in her step letters.  Finally, the timing of the discipline for the absences on September 30 and from October 8 to October 11 is suspicious because of the delay in writing up the plaintiff for the absences. In addition, the changes in the plaintiff's attendance sheets reinforces the suspicion that the defendants sought to punish the plaintiff. Thus, the court concludes that there is enough evidence to warrant submitting the controversy to a jury.  Accordingly, the court recommends that the plaintiff's and the defendants' motions for summary judgment be denied with respect to the plaintiff's claim of retaliation in violation of the FMLA and the

41

claim proceed to trial.

### D.    The ERISA

The plaintiff's ERISA allegations allow the court to dispose of them with minimal legal discussion.  The plaintiff has two claims: the defendants fired her instead of advising her that she could, if not terminated, be allowed to continue on short-term leave and then long-term disability; and, the defendants failed to produce records that she had requested.[14]  With respect to the failure-to-advise claim, the court finds that the plaintiff has failed to state a cognizable claim under the ERISA.  The plaintiff has produced no evidence or case law indicating that any of her rights in respect of this issue were violated.  The sole statement of fact on this issue shows only that the defendants never thought to consider the option or to mention its possibility to the plaintiff.  But there is no evidence that the plaintiff had any right to be allowed to continue short- or long-term benefits instead of being terminated. If the plaintiff was subject to termination under the RAP, as the defendants believed, she could be terminated regardless of any SADBP short- or long-term benefits she might have been eligible for had she not been terminated. The defendants' failure to consider the option and to advise the plaintiff of it is simply not a violation of any ERISA provision.

With respect to the plaintiff's claim that the defendants failed to disclose

_____

[14]As discussed above, the court deduced these claims from the parties' submissions in addition to the amended complaint.

requested records to her in violation of the ERISA, the court finds that claim is meritless because it addresses alleged inaction by Core.  In the amended complaint and the plaintiff's motion, the claim is raised against defendants Verizon and Sanders.  However, the record reveals that the claim really only concerns Core, which was dismissed by stipulation from the case.  The parties agree that she requested the allegedly nondisclosed records from Core, not defendants Verizon or Sanders, because the fax was sent to Core and there is no evidence that defendants Verizon or Sanders received or knew of the fax.  (Doc. Nos. 69 ¶ 97 & 96 ¶ 97.)  Accordingly, the plaintiff has no basis for her ERISA claims, and the court recommends that the plaintiff's motion for summary judgment be denied with respect to her claims that the defendants' failed to advise her of a right to and allow her to take short- or-long-term disability leave instead of terminating her and failed to produce requested records,  the defendants' motion be granted with respect to those claims, and the plaintiff's complaint be dismissed as against all defendants with respect to those claims.

## V.    Conclusion

On the basis of the foregoing, **IT IS RECOMMENDED THAT**:

(1).    the plaintiff's motion for summary judgment be **DENIED** with respect to her disparate-treatment and disparate-impact claims under the ADA and the PHRA, the defendants' motion for

43

summary judgment be **GRANTED** with respect to those claims, and the plaintiff's complaint be **DISMISSED** as against defendants Verizon with respect to those claims.

(2). the plaintiff's motion for summary judgment be **GRANTED** with respect to her claim of unlawful interference with her FMLA rights arising from the denial of leave for the period from May 2 to June 30, the defendants' motion for summary judgment be **DENIED** on this claim, and the claim proceed to trial only for the purpose of determining damages under 29 U.S.C. § 2617;

(3). the plaintiff's and the defendants' motions for summary judgment be **DENIED** with respect to her claim of unlawful interference with her FMLA rights arising from the denial of leave for the period from July 24 to August 4 and the claim proceed to trial;

(4). the plaintiff's motion for summary judgment be **DENIED** with respect to her claim of retaliation in violation of the ADA and the PHRA, the defendants' motion be **GRANTED** with respect to this claim, and the plaintiff's complaint be **DISMISSED** as against defendants Verizon with respect this claim;

(5). the plaintiff's and the defendants' motions for summary judgment be **DENIED** with respect to the plaintiff's claim of retaliation in violation of the FMLA and the claim proceed to trial;

(6). the plaintiff's motion for summary judgment be **DENIED** with

respect to her claims that the defendants' failed to advise her of a right to and allow her to take short- or-long-term disability leave instead of terminating her and failed to produce requested records,  the defendants' motion be **GRANTED** with respect to these claims, and the plaintiff's complaint be **DISMISSED** as against all defendants with respect to these claims.



S/ Malachy E. Mannion
**MALACHY E. MANNION**
United States Magistrate Judge


Date: January 12, 2007
O:\shared\REPORTS\2005 Reports\05-0064.01.wpd